**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DANIELA GUAIQUIRE,

      Petitioner,

v.                                                                    Case No. 6:26-cv-169-RBD-RMN

LOUIS A. QUINONES, JR.;
IMMIGRATION AND CUSTOMS
ENFORCEMENT; ICE FIELD
OFFICE DIRECTOR, ORLANDO
FIELD OFFICE; and UNITED
STATES DEPARTMENT OF
HOMELAND SECURITY,

      Respondents.

_____

## <u>ORDER AND INJUNCTION</u>

Before the Court is the Petition for Writ of Habeas Corpus and request for a

Temporary Restraining Order. (Doc. 1.)

## BACKGROUND

Petitioner Daniela Guaiquire is a young woman who fled Venezuela and

entered the United States through a point of entry in 2024. (Doc. 1, p. 11; Doc. 13,

p. 2.) At that time, Guaiquire was issued a Notice to Appear advising her that she

was an "arriving alien" and setting a hearing before an immigration judge two

years hence. (Doc. 1, pp. 14–15.) In the interim, Guaiquire filed an application for

asylum, which remains pending. (*Id*. at 3, 12–13.) She was issued a Florida driver's

license, a Social Security card from the Department of Homeland Security ("DHS") for work purposes, and a U.S. Employment Authorization Document valid through 2030.[1] (*Id.* at 8–10.)

Guaiquire got a job driving for Uber, and she lived and worked here in Central Florida without incident until Tuesday, January 20, 2026, when she was arrested while performing her job. (*Id.* at 2; *see* Doc. 17.) She had not committed any crime. (Doc. 1, p. 2.) Rather, the only stated basis for her arrest was that she was "undocumented." (*Id.*) She was taken to the Orange County Jail, where she was held under a U.S. Immigration and Customs Enforcement ("ICE") detainer without criminal charges, a warrant, a hearing, or any written notice of the basis of her detention. (*Id.*)

On January 23, Guaiquire's attorney filed a petition for a writ of habeas corpus, arguing that her warrantless arrest and detention are unlawful and seeking a temporary restraining order ("TRO") to prevent her transfer from the local jail. (*See id.* at 1–2, 5.) That same day, the Court issued a brief paperless order granting the TRO only to the extent that Respondents—the Warden of the Orange County Jail, ICE, the ICE Orlando Field Office Director, and DHS—were ordered not to remove Guaiquire from the Orange County Jail, to preserve the status quo

---

[1] The Court reminds counsel that exhibits containing personally identifiable information should be filed as separate attachments that may be sealed.

pending further review. (Doc. 3); *see Maryanovsky v. Ripa*, No. 3:25-cv-1599, 2026 WL 25157, at *2 (M.D. Fla. Jan. 5, 2026) (Howard, C.J.); *cf. Valverde Mazorra v. Hyde*, No. 1:25-cv-13987 (D. Mass. Dec. 31, 2025) (Doc. 9). The Court followed that with a written order finding that the petition was likely to succeed on the merits, ordering an accelerated response, and setting an emergency hearing. (Doc. 4.)

But in the few hours before the Court could rule on the emergency request, ICE transferred Guaiquire from the Orange County Jail to the South Florida detention facility known as "Alligator Alcatraz." (*See* Docs. 6, 7.) A flurry of emergency weekend briefing ensued (*see* Docs. 6–9), but Guaiquire was quickly returned to the Orange County Jail under a new booking number. (Doc. 14, p. 4.)

Guaiquire's counsel represents that her transfer and return to the Orange County Jail is part of a cycle perpetuated by jail officials and ICE intended to artificially reset the hold period for noncitizen detainees. (*Id.* at 3–4; Doc. 17.) The Government's counsel briefly addressed this, asserting that this practice is intended to comply with 8 C.F.R. § 287.7(d), which provides a 48-hour hold period for "alien[s] not otherwise detained by a criminal justice agency." (*See* Doc. 17.)

The Court expressed skepticism that ICE assuming custody for a few hours, only to immediately return a detainee to a local jail, would satisfy that regulation. (*See id.*) Because it appears that Guaiquire was transferred out of the jail *before* the Court entered its order directing that she not be moved, this issue is not properly

before the Court in this instance. (Doc. 6.) Obviously, the inquiry would be much different if ICE was not complying with the Court's orders to keep detainees at the jail. *See, e.g., Juan T.R. v. Noem*, No. 0:26-cv-107 (D. Minn. Jan. 26, 2026) (Doc. 7) (Schiltz, C.J.).

On January 27, with Guaiquire back at the Orange County Jail, the Government filed a response to the petition.[2] (Doc. 13.) The Government argued the Court lacked jurisdiction over the petition under 8 U.S.C. §§ 1252(g) and 1252(b)(9), which govern decisions to commence or questions arising from removal proceedings. (*Id*. at 7–8.) The Government also argued that Guaiquire was subject to mandatory detention under § 1225, but that even if the Court determined her detention was subject to § 1226, she was only entitled to a bond hearing. (*Id*. at 8.) But the Government did not argue in the alternative that she was detained under § 1226. (*See id*.) Guaiquire replied, arguing that §§ 1252(g), 1252(b)(9), and 1225 are inapplicable and that she was entitled to immediate release. (Doc. 15.)

On January 28, at an emergency hearing, the Court orally granted the petition and ordered the Government to immediately release Guaiquire. (Docs. 17, 18.) This written order memorializes the Court's oral pronouncements.

---

[2] As the Court noted at the hearing, it appreciates Government counsel's far more measured, transparent, and useful briefing in this matter—on shorter notice—than the briefing in the *Gimenez Rivero* case.

## STANDARDS AND ANALYSIS

This case is not materially different from *Gimenez Rivero*, in which this Court joined hundreds of others in concluding that the Government using § 1225 to detain noncitizens already present in this country without hearings is unlawful. *See Gimenez Rivero v. Mina*, No. 6:26-cv-66, 2026 WL 199319 (M.D. Fla. Jan. 26, 2026).[3] Given the Government's scant briefing in *Gimenez Rivero*, which failed to present any cogent argument for applying § 1225, the Court did not need to delve deeply into the principles that compelled its conclusion. *See id.* at *3 n.5. But in its responsive briefing here (Doc. 16), the Government relied on a lengthy decision by recently appointed U.S. District Judge Jordan E. Pratt, articulating what he describes as the "minority view" in denying a similar petition. *See Lopez v. Dir. of Enf't & Removal Operations*, No. 3:25-cv-1313 (M.D. Fla. Jan. 26, 2026) (Doc. 9). A handful of judges against hundreds is more aptly described as an *outlier* than a *minority* view.[4] Nevertheless, *Lopez* warrants examination, presenting an opportunity for an in-depth explanation of why the teachings of the U.S. Supreme Court, the fundamental canons of statutory interpretation, and the principles undergirding this country's founding support this Court's *majority* view.

---

[3] The Court adopts that order in full.

[4] That petitioners who have the misfortune to be assigned to one of these outlier judges must remain unlawfully detained while others are set free does not escape this Court's notice. This disparate treatment is a consequence of district courts' recent loss of the power to issue nationwide injunctions. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

## I. The Judiciary has made it clear that § 1225 does not apply to aliens already present in the United States.[5]

Justice Alito, a noted statutory textualist,[6] told us so. Writing for the Supreme Court in *Jennings*, he explicitly stated: "§ 1226 applies to aliens already present in the United States." *Jennings v. Rodriguez*, 583 U.S. 281, 303 (2018).

Judge Pratt criticizes courts for relying on this and similar language in *Jennings*, deeming these statements "passing remark[s]" and calling it "error to substitute out-of-context dicta for the statutory text." *Lopez*, No. 3:25-cv-1313, at 20–21 (cleaned up). To be sure, the specific holding of *Jennings* is that § 1225(b) and § 1226(c) do not contain an implicit six-month time limit on immigration detention. *Jennings*, 583 U.S. at 297, 304. But the entirety of the opinion analyzes immigration officials' decisions to remove aliens at the border, grounds for removing aliens already present, and the statutes that provide for the Government's detention of aliens in the course of immigration proceedings. *Id.* at 285–86. Hardly out-of-context, or said in passing. The explanation that § 1225 applies to aliens at the border and § 1226 applies to aliens already present in the

---

[5] This Court jumps straight to the merits analysis because the Government's jurisdictional argument under § 1252(g) and *Gupta v. McGahey*, 709 F.3d 1062 (11th Cir. 2013), is bunk. *See Gimenez Rivero*, 2026 WL 199319, at *2–3. The Government's added citation here to § 1252(b)(9), which bars review of orders of removal or decisions to seek removal, is likewise inapposite because Petitioner challenges only her unlawful detention. *See DHS v. Regents of Univ. of Cal.*, 595 U.S. 1, 19 (2020). Even the "minority" view rejects this jurisdictional argument. *See Lopez*, No. 3:25-cv-1313, at 12.

[6] *See, e.g.*, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 683–734 (2020) (Alito, J., dissenting).

6

country might not *be* the holding of *Jennings*, but it is *essential* to the holding. *See Black v. United States*, 373 F.3d 1140, 1144 (11th Cir. 2004) ("*Dictum* is a . . . statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case.").

But even if we agree to label *Jennings*' lengthy discourse on the difference between § 1225 and § 1226 dicta, "[d]icta can, of course, have persuasive value." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010). "[T]here is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). The language Judge Pratt characterizes as a "passing remark" in fact represents two separately enumerated sections about the Supreme Court's thinking on "the proper interpretation of §§ 1225(b), 1226(a), and 1226(c)." *Jennings*, 583 U.S. at 289. "This is not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta. It is well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions." *Schwab*, 451 F.3d at 1325. So, as we must, "we give that reasoning and its clear implications substantial weight." *Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1242 (11th Cir. 2025). Until the Supreme Court speaks directly to the point here, *Jennings* is what we've got.

And the overarching thrust of *Jennings* teaches this: there is a difference between mandatory detainer for entrants at the border under § 1225, detaining

people already in the country under § 1226(a) with bond hearings, and detaining noncitizens accused of crimes under § 1226(c). *Jennings*, 583 U.S. at 286–89, 303, 306. These are different classes of people subject to different procedures. This distinction comports with the Supreme Court's longstanding recognition that noncitizens who are already within the United States have additional rights not extended to those at the border. *See Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001) (noting that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law" and collecting cases dating back to the 1800s). The Supreme Court's clear lesson from *Jennings* no doubt explains why the overwhelming majority of district courts continue to agree with this Court.[7] *See, e.g., Bethancourt Soto v. Soto*, No. 25-CV-

---

[7] A handful of judges have come to different conclusions on procedural grounds. *See, e.g., Fuenmayor Torres v. Quinones*, No. 6:26-cv-184 (M.D. Fla. Jan. 28, 2026) (Doc. 4, p. 12 n.3) (Moe, J.). This Court cannot agree.

This Petition provided documentary evidence that the Petitioner was already present at the time of detainer. (*See, e.g.*, Doc. 1, pp. 8–15.) Counsel served notice on the warden and explained the exigency of the situation. (*Id.* at 5); *see* Fed. R. Civ. P. 65(b)(1)(B). The Government quickly received notice, confirmed the basis for detention, and did not raise any factual or procedural challenges (Docs. 13, 17). These circumstances meet what is required for an injunction: a likelihood of success on the merits, imminent irreparable harm, and a balance of equities and the public interest in the Petitioner's favor. *See Rojano Gonzalez v. Sterling*, No. 1:25-CV-6080, 2025 WL 3145764, at *4–8 (N.D. Ga. Nov. 3, 2025). The initial injunction merely preserved the status quo by preventing the Petitioner from being moved for a short period (Doc. 3), which did not harm the Government, while the final mandatory injunction releasing the Petitioner (Doc. 18) was issued only after notice and no challenge to the facts, allaying any process concerns.

True, in this instance at least, the spirit but not the letter of Rule 65(b)(1)(A)—providing that specific facts must be in "an affidavit or a verified complaint"—was followed. Rather than the Petitioner verifying the Petition, counsel instead provided documentary evidence in support. (*See* Doc. 1, pp. 8–15.) But the Petitioner was being shuttled back and forth between local jails and detention centers (Doc. 7), so it would be impossible for her to have a notary witness her signature

16200, 2025 WL 2976572, at *7 (D.N.J. Oct. 22, 2025) (collecting cases).

But as Justice Alito and Judge Pratt would have us do, let's look to the statutory text—because *Jennings* notwithstanding, the bedrock principles of statutory interpretation compel this Court's conclusion.

## II.     The Legislature has made it clear that § 1225 does not apply to aliens already present in the United States.

The Legislature passed the following law requiring mandatory detainer of certain noncitizens: "in the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien *shall be* detained . . . ." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). In other words, this statute says that if an alien is *both* an "applicant for admission" and "seeking admission," they are subject to mandatory detainer. *See Kashranov v. Jamison*, No. 2:25-CV-5555,

---

verifying the Petition. And subsequent petitions *have* been verified by counsel in lieu of the client, given this impossibility. *See, e.g.*, *Mora Duran*, No. 6:26-cv-265 (M.D. Fla. Feb. 1, 2026) (Doc. 1).

The rules explicitly contemplate that courts will construe them to effectuate a just resolution, including modifying them as necessary. *See* Fed. R. Civ. P. 1; Local Rule 1.01(b). And courts must construe the rules to resolve cases on their merits rather than technicalities. *See Foman v. Davis*, 371 U.S. 178, 181–82 (1962); *Des Isles v. Evans*, 225 F.2d 235, 236 (5th Cir. 1955). This situation cries out for using the rules as they were designed: to effectuate justice. Where the Government created the situation ensuring that Petitioners cannot comply with the letter of the verification rule, Petitioners substantially complied with the spirit of the rule, and the Government does not challenge it, this Court will consider the petitions on their merits rather than kicking them for procedural technicalities.

(As an aside: in addition to Rule 65(b)(1), the *Fuenmayor Torres* case also takes issue with that petition purportedly failing to comply with the Habeas Rules. *See* No. 6:26-cv-184, at 7–10. That gripe is more puzzling, as the Habeas Rules only mandatorily apply to habeas petitions under §§ 2254 and 2255, not the instant § 2241 petition. *See* Habeas R. 1(a).)

2025 WL 3188399, at *6 (E.D. Pa. Nov. 14, 2025).

Defining an "applicant for admission" is easy: the statute does it. An "applicant for admission" is any "alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1). So all aliens, unless they have been "admitted," are "applicants for admission." The question then is what does "seeking admission" mean?

Multiple canons of statutory interpretation—the basic rules courts follow in understanding what a law means—make it clear that noncitizens already present in this country are not "seeking admission," so § 1225 does not apply.

## A.    Plain Meaning

First, the plain meaning of the statutory text establishes that the phrase "seeking admission" requires an affirmative action taken to gain physical entry at the border, so it cannot apply to people who have already been living in this country.

The plain meaning canon provides that in interpreting a statute, courts must begin with its text, giving the words used their ordinary meaning. *See Ingalls Shipbuilding, Inc. v. Dir., Off. of Workers' Comp. Programs*, 519 U.S. 248, 255 (1997). This meaning is "fixed at the time of enactment." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). Courts must also read words "in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*,

489 U.S. 803, 809 (1989).

When Congress added "seeking admission" to the Immigration and Naturalization Act ("INA") in 1996, "seek" meant "to try to acquire or gain." *Seek*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996). The use of the present participle—"seeking"—necessarily implies "affirmative, present-tense action." *Bethancourt Soto*, 2025 WL 2976572, at *5 (D.N.J. Oct. 22, 2025); *see Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1307 (11th Cir. 2022) ("A present participle is used to signal present and continuing action."); *see also Kashranov*, 2025 WL 3188399, at *6; *Martinez v. Hyde*, 792 F. Supp. 3d 211, 218 (D. Mass. 2025); *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 488 (S.D.N.Y. 2025).[8]

The INA defines "admission" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). While undefined in the INA, dictionaries from 1996 defined "entry" as "the act of entering." *Entry*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996); *see also Enter*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996) (entering means "[t]o come or go in"); *Entry*, BLACK'S

---

[8] Judge Pratt writes these courts off as "guardedly assert[ing]" that *seeking* necessarily implies "some sort of present-tense action." *See Lopez*, No. 3:25-cv-1313, at 16 (cleaned up). This Court does not read the words "some sort of" in *Lopez Benitez* and *Martinez* as being "guarded." Quite the contrary: reading a present participle to imply some sort of present-tense action is simply…how grammar works. *See Laube v. Allen*, 506 F. Supp. 2d 969, 980 (M.D. Ala. 2007) (citing John B. Opdycke, *Harper's English Grammar* 141 (rev. ed. 1966)).

LAW DICTIONARY (6th ed. 1990) (in the immigration context, entry is "any coming of an alien into the U.S. from a foreign part or place or from an outlying possession, whether voluntary or otherwise").

So the thing to be "acquired" by an alien "seeking admission" is physical "entry" into the United States, and undertaking an "affirmative, present-tense action" to do so. *See Kashranov*, 2025 WL 3188399, at *6. Taken all together then, "seeking admission" refers to affirmative action taken by an alien to physically enter the United States after inspection and authorization by an immigration officer, usually at the border or a port of entry. *See id.* Under the plain meaning of the term, an alien who is already present in the United States, long past the point of entry,[9] cannot be "seeking admission," so § 1225(b)(2)(A), on its face, does not apply to people like Petitioner. *See id.* ("While [the petitioner] is an applicant for admission, he is not seeking admission. He's already here."); *Bethancourt Soto*, 2025 WL 2976572, at *6; *Lopez Benitez*, 795 F. Supp. 3d at 487. This plain meaning is consistent with the Supreme Court's teaching that people already in the country

_____

[9] This case, and similar petitions, hardly represent the kind of threshold situations in which an alien is apprehended shortly beyond the border, both geographically and temporally near the point of entry. *Cf. DHS v. Thuraissigiam*, 591 U.S. 103, 140 (2020). So the Court need not indulge in a parade-of-horribles fantasy about people apprehended a few steps over the border and hand-wringing about whether they are already present in the country. Rather, these petitions arise from the unlawful mass detention of people who have already been living and working here for significant periods of time, so there is no question that they are within our borders and not "seeking admission." *See Lopez Benitez*, 795 F. Supp. 3d at 486–87.

are not seeking admission. *See Jennings*, 583 U.S. at 289 ("U.S. immigration law authorizes the Government to detain certain aliens *seeking admission* into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." (emphasis added)).

### B.    Surplusage in § 1225

Second, the canon against surplusage mandates that the phrase "applicant for admission" must have a different meaning than the phrase "seeking admission."

The canon against surplusage provides that each and every word of a statute must be given meaning. *See Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883). This is perhaps the strongest explanation for why the "minority" view espoused in *Lopez* collapses on closer examination.

*Lopez* concluded that all "applicants for admission" are "seeking admission." *Lopez*, No. 3:25-cv-1313, at 15. In other words, in the sentence "in the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained," Judge Pratt reads the two italicized phrases to mean the same thing. That reading is the *only* way to end up at the conclusion that all applicants for admission—all aliens present in this

country without admission status—are "seeking admission" and thus that they all can be mandatorily detained under § 1225, indefinitely, with no hearing.

But how can this reading be squared with the text of the statute? Congress knows how to define "applicant for admission" because they did it, just one subsection earlier. *See* 8 U.S.C. § 1225(a)(1). Why use another phrase, "seeking admission," in the same sentence as "applicant for admission" if they mean the same thing? They don't. Courts can't read words out of a statute to fit a predetermined conclusion. That would make us legislators, not jurists.

Because Judge Pratt's interpretation would improperly render the phrase "seeking admission" mere surplusage, duplicative of the phrase "applicant for admission," it doesn't pass muster under the fundamental canons of statutory interpretation. *See Gomez-Pena v. Sec'y, DHS*, No. 3:25-cv-1287, 2026 WL 83980, at *5 (M.D. Fla. Jan. 12, 2026) (Howard, C.J.) (collecting cases "almost universally reject[ing]" this interpretation); *see also Bethancourt Soto*, 2025 WL 2976572, at *6; *Kashranov*, 2025 WL 3188399, at *7; *Lopez Benitez*, 795 F. Supp. 3d at 488. An alien can be an "applicant for admission" if they are physically present in the United States without having been admitted, but not actively "seeking admission" because they are not at a border seeking to enter the United States.[10] *See Lopez*

---

[10] Judge Pratt cites § 1225(a)(3), which provides that "[a]ll aliens . . . who are applicants for admission *or otherwise seeking admission* . . . shall be inspected by immigration officers," to support

14

*Benitez*, 795 F. Supp. 3d at 488. This is the only way to read § 1225(b)(2)(A) properly, in a way that gives effect to every word of the law written by Congress.

## C.    Superfluousness of § 1226

The surplusage issue within § 1225(b)(2)(A) is a sufficient stopping point. But additional principles undermine the Government's position. Reading § 1225 to mean that all nonadmitted aliens present in this country are subject to mandatory detention would render the Laken Riley Act—the most recent expression of Congress's intent pertaining to immigration detainer—improperly superfluous.

A part of the canon against surplusage is that not only must every word of a statute be given meaning, but also different provisions in the same statutory scheme must be read as a whole. This canon is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *see Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

---

his reading that "applicants for admission" means the same thing as "seeking admission." *See Lopez*, No. 3:25-cv-1313, at 15. But this reference actually proves the opposite point. Applicants for admission who are *at the border* are also seeking admission. But not *all* applicants for admission are seeking admission; otherwise, § 1225(b)(2)(A) would make no sense.

*Lopez*'s interpretation strains credulity. *See* No. 3:25-cv-1313, at 18. Despite its protestations to the contrary, *Lopez*'s reading would render the Laken Riley Act's recent amendments to § 1226(c) both superfluous and ineffective. *See Gomes v. Hyde*, No. 1:25-CV-11571, 2025 WL 1869299, at *6 (D. Mass. July 7, 2025). Because none of the detainees petitioning the Court to this point have been accused of a crime, we haven't had to dive into § 1226(c). No time like the present.

Like § 1225(b)(2)(A), § 1226(c) provides for mandatory detainer; this section addresses aliens who are accused of certain crimes. *See* 8 U.S.C. § 1226(c)(1). Section 1226(c)(1)(E), which expands the mandatory detainer to aliens who are "charged with, [] arrested for, [] convicted of, [or] admit[] having committed" certain crimes, was added to the statutory scheme in 2025 by the Laken Riley Act. *See Gomes*, 2025 WL 1869299, at *6. There, Congress expressed a clear intent for mandatory detention of noncitizens present in the country and accused of certain crimes. *See Ndiaye v. Jamison*, No. CV 25-6007, 2025 WL 3229307, at *6 (E.D. Pa. Nov. 19, 2025).

If *all* noncitizens present in this country are subject to mandatory detainer, as the Government urges, why would we need the Laken Riley Act? Why would we need § 1226(c) at all? We wouldn't. The only way to read § 1225 and § 1226 together in a coherent way is that § 1225(b)(2)(A) applies to those at the border seeking admission, and § 1226(c)(1)(E) applies to those already present who are

16

accused of crimes. Both of those classes of aliens are subject to mandatory detention. But some of the nonadmitted aliens in this country are not. A reading of the statute that renders the Laken Riley Act and § 1226(c) superfluous cannot be correct. *See Ndiaye*, 2025 WL 3229307, at *6 ("The Government's interpretation of § 1225 would cause the Laken Riley Act's provisions to have no actual impact on immigration detention. This cannot be. In amending § 1226 to require mandatory detention of certain classes of inadmissible noncitizens, Congress intended these amendments to have real and substantial effect. . . . To hold otherwise would be the definition of improper surplusage."); *see also Martinez*, 792 F. Supp. 3d at 221; *Lopez Benitez*, 795 F. Supp. 3d at 490.

As Judge Pratt rightly notes, it is not a court's role to "second-guess Congress's policy choices, as reflected in the statutory text." *Lopez*, No. 3:25-cv-1313, at 9. A year ago, faced with the commission of a horrific crime by an alien, the elected Legislature moved to protect the public by requiring that aliens accused of certain crimes be detained. They knew how § 1225 and § 1226 worked, and they added § 1226(c)(1)(E) accordingly. If Congress believed that § 1225 required all nonadmitted aliens present in this country to be mandatorily detained, the Laken Riley Act would have been unnecessary. They would not have passed it. This Court is not in the business of reading whole statutory sections out of the law. *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1187 (11th Cir. 1997)

("Courts have no authority to alter statutory language."). Far from effectuating Congress's intent, *Lopez*'s reading of the statute would do the opposite.

### D. Absurdity

Finally, the canon against absurdity provides that "statutory language should not be applied literally if doing so would produce an absurd result." *Id.* at 1188. We're dealing with sort of the inverse here: the plain language of § 1225, which is "quite clear," *Jennings*, 583 U.S. at 303, can and should be applied literally. It does not apply to noncitizens already present within the country. The Government asks the Court not only to ignore the plain meaning of the statute, but also to construe the statute in a way that would produce an absurd result. This the Court cannot do.

Consider this hypothetical. An alien admitted under an H-1B visa commits a crime like, say, driving under the influence of alcohol. That's a dangerous crime, creating great risk to the public. Nevertheless, he would get a bond hearing under § 1226(a) as someone with admitted status. There is a process that would be followed: a warrant would go out, and a judge would decide whether he's dangerous, or a flight risk, before he could be detained for an extended period.

Compare him to Ms. Guaiquire, who did everything the "right way." She arrived at the border from a country known for violence—a country with deplorable conditions and a recently arrested president. She applied for

humanitarian asylum and was given parole. She was deemed to be of so little risk that she was allowed into the country by immigration officials and given documentation to work. She got a job driving legally. She complied with the terms of her parole and is awaiting the immigration court's determination on whether her asylum will be granted. She has done everything asked of her. She has committed no crime. Yet she was arrested at her job, taken to the county jail, then taken to Alligator Alcatraz, to be detained indefinitely with no chance of a bond hearing—no opportunity for a judge to decide whether she's dangerous. Considering ICE already determined she wasn't dangerous when she arrived at the border less than two years ago, there's every reason to believe she's a lot less dangerous than the admitted alien driving drunk.

This disparate treatment fails the smell test. People already present in this country are subject to certain protections. That's how it's always been. *See Zadvydas*, 533 U.S. at 693–94. Changes in administration do not change established law without legislative cooperation, nor do they change the canons of statutory construction courts use every day to decide what statutes mean. This Court will not contort the statute to remove those protections when every rule of statutory interpretation compels otherwise. That would be absurd.

Section 1225 means what it says. Mandatory detainer applies to noncitizens "seeking admission" at the border. Section 1226, and the protection of a bond

hearing, applies to noncitizens already present within our borders. *See also Jennings*, 583 U.S. at 289, 303, 306. So Petitioner's detention under § 1225 was unlawful.

### III.    The Executive lacks the power to dictate the meaning of § 1225.

Last but far from least: the Government's continued reliance on *In re Yajure Hurtado*, 29 I.&N. Dec. 216 (2025), a Board of Immigration Appeals ("BIA") decision, is troubling on a fundamental level. (Doc. 13, pp. 3–4.) The Government cites *Ardestani v. U.S. DOJ, INS*, 904 F.2d 1505 (11th Cir. 1990), for the proposition that the Court must defer to the BIA's decisions. (Doc. 13, pp. 3–4.) But *Ardestani* does not say that. Here the Government resorts to the kind of sloppy, misleading briefing this Court has criticized in the past. *See Gimenez Rivero*, 2026 WL 199319, at *5–6. *Ardestani* says that when reviewing a factual issue decided by the BIA, courts must affirm if the BIA's decision is supported by substantial evidence. 904 F.2d at 1508. But that standard only applies to factual issues, "not a purely legal issue as we have in this case." *Id.* Federal courts owe no deference whatsoever to the BIA on questions of law. *See id.* So this Court is not bound in any way by *Hurtado*, and the Government's implication to the contrary is disingenuous. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024) (courts, not agencies, have "special competence" in resolving statutory interpretation). Indeed, kowtowing to an agency's interpretation of the scope of its own power is "the

occasion on which abdication in favor of the agency is *least* appropriate." *Id.* at 401.

This Court has taken great pains to explain why the BIA is wrong about what § 1225 means on a statutory level. *See also Gimenez Rivero*, 2026 WL 199319. But a stronger constitutional reason exists to reject the BIA's wrongheaded interpretation of the immigration code, namely, the separation of powers. While the relative sphere of power of the three branches is currently under great strain, Article III courts are serving as the proverbial "judicial finger in the constitutional dike." *Conejo Arias v. Noem*, No. SA-26-CV-415 (W.D. Tex. Jan. 31, 2026) (Biery, J.).

"It is emphatically the province and duty of the judicial department"—not the Executive—"to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). The Judiciary "has imposed upon it by the constitution, the solemn duty to interpret the laws, . . . and however disagreeable that duty may be, in cases where its own judgment shall differ from that of other high functionaries, it is not at liberty to surrender, or to waive it." *United States v. Dickson*, 40 U.S. 141, 162 (1841). "Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011).

The American people rebelled against the tyrant King George III in part

because he "made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries," leading to judges abusing the rights of the people to curry favor with the Executive. THE DECLARATION OF INDEPENDENCE ¶ 11 (U.S. 1776). So the Framers, in their genius, established the Judiciary as independent from the Executive to protect the people—for, as Alexander Hamilton wrote, "liberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments." THE FEDERALIST No. 78, at 403 (Alexander Hamilton) (Gideon ed., 1818). "A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." *United States v. Will*, 449 U.S. 200, 217–18 (1980).

Often unappreciated by the general public is that immigration judges serve at the whim of the President. *See generally* Alisa Chang, *The Trump Administration Fires at Least 7 Immigration Judges in New York*, NPR (Dec. 2, 2025), https://www.npr.org/2025/12/02/nx-s1-5628393/the-trump-administration-fires-at-least-7-immigration-judges-in-new-york. They are members of the Executive branch, not independent Article III judges. They lack life tenure and are dependent on the President for their livelihood. They cannot always be expected to safeguard the rights of individuals in the same way as the independent

Judiciary must. *See Stern v. Marshall*, 564 U.S. 462, 483–84 (2011). So no, the Judiciary won't be deferring to the Executive branch about what the law says.

Nor will this Court acquiesce to a statutory interpretation urged by the Executive that reads out entire sections drafted by the Legislature. Just as the Judiciary must remain independent for this country to function, so too must the Legislature. The power to eliminate entire portions of statutes rests with the elected members of the Congress of these United States. *See id.*; *Marbury*, 5 U.S. at 177. Adopting the Government's interpretation of § 1225, which by necessity acts as if § 1226 does not exist, amounts to the Executive's unilateral elimination of an act of Congress, something wholly alien to our system. *See Bautista v. Santacruz*, No. 5:25-CV-01873, 2025 WL 3713987, at *12 (C.D. Cal. Dec. 18, 2025) ("Respondents' expansive interpretation . . . would effectively nullify a portion of the INA through [] DHS's . . . interpretive exercise of power."). What the Government is in effect urging is to give the Executive free rein to rewrite acts of Congress to suit its purpose and to tell the Judiciary what those laws must mean. This the Court cannot do, for it would fall victim to the very evils the Framers rejected 250 years ago. So the Court gives *Hurtado* the deference a decision drafted by immigration judges wholly beholden to the Executive deserves: none.

## CONCLUSION

There is an easy fix to bring the Government into compliance with the law

as written: Detain aliens under the appropriate statute and give them bond hearings. If these noncitizens are dangerous, immigration judges may detain them after a hearing, protecting the public—just as U.S. Magistrate Judges consider pretrial detention for people accused of crimes every single day in this Republic.

That's all the law requires. If you're living in the United States, and armed men take you off the street when you've done nothing wrong, a judge must decide whether you're dangerous before the Government can keep you indefinitely locked up, separated from your family, deprived of your livelihood, and stripped of your dignity and purpose, until it gets around to deciding whether to deport you.

Nothing in the law prevents any presidential administration from pursuing more or less immigration enforcement as a policy matter. After all, people's feelings about immigration change over time. *See, e.g.*, *Exodus 23:9 (NIV)* ("Do not oppress a foreigner; you yourselves know how it feels to be foreigners, because you were foreigners . . . ."). The Executive, duly elected by the people, is free to make whatever policy choice it wishes, so long as it is consistent with the law. Of course, the Executive too has a "sacred oath to . . . preserve, protect and defend the Constitution of the United States, . . . [and] take Care that the Laws be faithfully executed." *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 173 (D. Mass. 2025) (Young, J.) (quoting U.S. CONST. art. II, §§ 1, 3) (cleaned up).

Policy is the Executive's job. But passing the law is the Legislature's job. And saying what the law means and ensuring that the law is followed by the Executive—just like everyone else—is the Judiciary's job. We'll keep doing it.

Accordingly, it is **ORDERED AND ADJUDGED**:

1.  The Petition for a writ of habeas corpus and request for a temporary restraining order (Doc. 1) is **GRANTED**.

2.  Respondents the Warden of the Orange County Jail, ICE, the ICE Orlando Field Office Director, and DHS, and all other persons or entities acting in active concert or participation with them, are **PERMANENTLY RESTRAINED AND ENJOINED** from detaining Petitioner Daniela Guaiquire under 8 U.S.C. § 1225.

3.  Respondents the Warden of the Orange County Jail, ICE, the ICE Orlando Field Office Director, and DHS, and all other persons or entities acting in active concert or participation with them, are **TEMPORARILY RESTRAINED AND ENJOINED** from detaining Petitioner Daniela Guiaquire under 8 U.S.C. § 1226(a) until at least **Monday, February 9, 2026**. Should Respondents elect to later detain her under that statute after that date, Respondents are **DIRECTED** to release her within ten days of her detainer unless she is provided with a bond hearing before an immigration judge during that ten-day

period. If she is redetained and released, Respondents must facilitate her transportation from the detention facility by notifying her counsel of the time and place where she may be collected.

4. No security bond is required for this injunction as the Court deems it unnecessary.

5. Petitioner is **DIRECTED** to notify her counsel should her place of residence change while her immigration proceedings are ongoing.

6. The Clerk is **DIRECTED** to enter judgment in favor of Petitioner and against Respondents and then to close the file.

7. The Court **RETAINS** jurisdiction to enforce the terms of this Order. If Petitioner is later detained and deprived of a timely hearing but not released as ordered herein, she may move to reopen this case without opening a new file. The Court also retains jurisdiction to consider the matter of fees and costs.

 **DONE AND ORDERED** in Chambers in Orlando, Florida, on February 3, 2026.



ROY B. DALTON, JR.
United States District Judge